## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

SAMBA VEDULA,

     Plaintiff,

     v.

ALEX AZAR, *Secretary,*
*U.S. Department of Health and Human Services,*

     Defendant.

Civil Action No. TDC-18-0386

## MEMORANDUM OPINION

Plaintiff Samba Vedula filed this civil action against the Secretary of Health and Human Services ("HHS") in which he has alleged that he was subjected to unlawful discrimination, retaliation, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 (2018), while working at the National Institutes of Health ("NIH"), a component agency of the United States Department of Health and Human Services. Pending before the Court is HHS's Motion for Summary Judgment, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, HHS's Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I.    NIH Employment

Vedula, who is a man of Indian national origin, has worked since 2010 as a Systems Accountant at the General Schedule-14 ("GS-14") level at the NIH Business Systems ("NBS") Operations and Maintenance Division and has been the Accounts Payable ("AP") Lead on the

Accounts Payable / Accounts Receivable and Travel team. At NBS, Vedula's first-level supervisor was Carol Perrone, GS-15, Director of NBS Operations and Maintenance; Vedula's second-level supervisor was Charles Singleton, GS-15, Director of NBS. Perrone was born in Guyana and identifies as a West Indian female; Singleton identifies as a white male.

In May 2016, Perrone hired Sophia Ferrer, who is female and identifies as Black, into the role of a GS-14 Systems Accountant at NBS. Ferrer's role was the General Ledger ("GL") Lead. Ferrer was not a formal supervisor, but because all areas of accounting affect the general ledger, Perrone had commented to several Systems Accountants, including Vedula, that they were to report on and coordinate their activities with Ferrer.

## A.   The OPE Decommission Project

In January 2016, Vedula started working on a project referred to as the "OPE Decommission Project" ("the OPE Project"), and at the kickoff meeting he was tapped by Perrone to serve as the project manager for the effort, a role in which he led a team responsible for the OPE transactions. This leadership role did not come with an increase in grade or pay. According to Vedula, the OPE Project was supposed to extend at least through the end of 2016, but it ended abruptly near the end of September 2016, and Vedula was removed as the project manager.

According to Perrone and Singleton, the OPE Project was put on hold at that time after it was discovered that the system underlying the OPE Project, which had been provided by contractors, was not compliant with the Accounting Treatment Manual that HHS must follow. Perrone has asserted that she and Singleton, as the contracting officer representatives, made this decision in July 2016, that it was communicated to Vedula that same month, and that Vedula had been aware of events leading up to this determination because he had been included in relevant meetings and email exchanges on this issue as the project lead. Singleton has likewise stated that

2

the decision to terminate the OPE Project was made in mid-July 2016 due to non-compliant accounting treatment.

**B.    The September 2016 Meeting**

On September 14, 2016, in the midst of a meeting about the OPE Project that Vedula was conducting in his office with several federal employees and contractors ("the September 2016 Meeting"), Ferrer shoved the door open, came into the office, and started talking to Vedula in a "very high tone" accusing him of performing certain tasks wrongly. Joint Appendix ("J.A.") 168, ECF No. 51. According to Vedula, the yelling lasted five to ten minutes, then Ferrer departed the office, leaving Vedula "in tears." J.A. 168.

Other attendees at the September 2016 Meeting described this exchange in a similar manner. According to Mohamed Tanvir Abdulazeez, a government contractor, Ferrer "barged" into the meeting without knocking, appeared "very angry," and started screaming at Vedula. J.A. 361. When Vedula tried to reply, Ferrer would not let him speak. Sangeeta Wadhwa, a new NBS Systems Accountant who was also in Vedula's office for the meeting, has stated that Ferrer barged in and, "in a loud and disrespectful tone," began asking Vedula questions. J.A. 366. Wadhwa characterized Ferrer's tone as "reprimanding" Vedula and her behavior as inappropriate. *Id.* Wadhwa also described Vedula as appearing upset and embarrassed at how Ferrer was speaking to him in front of his colleagues. Finally, JoJo Ferguson, another NBS Systems Accountant who was at the September 2016 Meeting, has stated that Ferrer came into the closed-door meeting and began raising her voice at Vedula about needing to clear certain tasks with her first. According to Ferguson, Ferrer has a history of yelling at co-workers and "got nasty really quickly and was very rude to Vedula." J.A. 372. Vedula tried to stop the confrontation by asking her to send him an email about the matter, but Ferrer declined to do so and continued to yell at him.

3

According to Ferrer, on September 14, 2016, she went to Vedula's office to ask him some time-sensitive questions about an item that he permitted to be processed in the accounting system. Ferrer claims that Vedula was offended that she had come to his office to ask him questions and then proceeded to yell at her and told her that she should instead send him an email if she had a question. Ferrer denies that she spoke harshly to Vedula and claims that she has no history of yelling at coworkers.

After the September 2016 Meeting, Vedula reported the incident to Singleton since his direct supervisor, Perrone, was on vacation. When Perrone returned to the office and heard Vedula's account, she downplayed the incident as a communication issue and suggested enlisting the NIH ombudsman's office to conduct a communication workshop. When Vedula went to the ombudsman's office, he learned about the Equal Employment Opportunity ("EEO") process and then, on September 19 or 20, 2016, told Perrone and Singleton that he intended to file an EEO complaint. They asked him not to file the complaint until after the "books were closed," presumably at the end of the fiscal year on September 30, 2020. J.A. 4. On September 25, 2016, Vedula contacted an EEO counselor about the incident, and he filed a formal complaint on November 8, 2016. Vedula also claims that on an unspecified date in this time frame, he was "demoted," and Wadhwa, who had less knowledge and experience, was put his in place. J.A. 9.

### C.    Systems Accountant Leader Position

In December 2016, NBS issued a vacancy announcement for a Systems Accountant Leader position. According to Perrone, the position was created after Vedula had complained in July 2016 that Perrone had designated Ferrer, the GL Lead, instead of him, to act on her behalf when Perrone was on leave. Human Resources ("HR") then informed her that she could not just deem

4

the GL Lead to be the team leader in such situations as she had done in the past, and instead there needed to be a separate, team leader position.

The position was formally opened on Friday, December 2, 2016 and closed on Tuesday, December 6, 2016 and thus remained open for only three business days. According to Vedula, the position requirements were tailored to match Ferrer's limited experience. The position required only one year of specialized accounting experience equivalent to the GS-13 level, even though the other lead positions were all at the GS-14 level and held by accountants with six years of experience. Vedula also asserts that the very limited time for applicants to submit applications favored Ferrer because Perrone had given her advanced notice of the posting and shared interview questions with her. In October 2016, Perrone sent Ferrer an email with an attachment labeled "acct_lead_questions.doc," J.A. 348, which contained certain questions that matched questions later posed by the interviewers for this position. Perrone has asserted that some of the questions were submitted to her by Ferrer as part of earlier hiring processes but acknowledged that no other candidates had supplied interview questions eventually used in the Systems Accountant Leader interviews. According to Vedula, the majority of the technical questions used in the interviews related to the GL area with which Ferrer was most familiar.

Vedula was one of 12 candidates deemed eligible for the position after an HR applicant review. Four of those candidates were interviewed—Vedula, Ferrer, Ferguson, and Michael Snyder, another NBS Systems Accountant. All were interviewed on January 5, 2017 by a three-member panel of independent subject matter experts in budget and accounting from across HHS and NIH consisting of Wesley Yon, the HHS Director of the Division of Accounting Standardization and Monitoring; Karen Brown, the Supervisory Accountant and Director of the

5

Financial Reporting Division in the NIH Office of Financial Management; and Ann Fitzpatrick, the NIH Budget Officer with the National Human Genome Research Institute.

The panel recommended that Ferrer be selected after finding that she had "extensive experience" with Oracle e-business applications, a "comprehensive understanding" of federal accounting principles, a comprehensive knowledge of the NBS environment, the ability to answer all technical questions accurately, and the ability to articulate how she would lead the team.  J.A. 431.  As for Vedula, the panel found that he did not demonstrate the accounting knowledge required for the lead role, did not have detailed knowledge of initiatives underway at NIH, did not answer technical questions accurately, and did not clearly explain his leadership style.  Perrone and Singleton both concurred with the panel's recommendation, and after receiving positive reference checks, Singleton submitted the selection to the NIH Deputy Director for Management for final approval.  Ferrer's promotion was announced at an NBS staff meeting on January 25, 2017.

On December 20, 2016, during the selection process, Vedula, Snyder, and another NBS colleague, Phil Hwang, had raised concerns to NIH Director Francis Collins about the Systems Accountant Leader hiring process.  On January 12, 2017, Snyder, copying Vedula and Hwang, sent an email to Collins alleging that NBS management was exhibiting favoritism towards Ferrer. For instance, as to the hiring process, the email stated that NBS staff did not have sufficient advance notice of the opening as the position was open for only five calendar days and was announced to NBS staff on the afternoon before the posting was closed, and that the position description required only GS-13 experience to accommodate Ferrer's lack of a complete year of experience as a GS-14.  The email also listed several alleged instances of verbal abuse by Ferrer against other NBS staff, including the September 2016 Meeting, and warned that NBS

6

management was favoring the promotion of someone who had brought violent confrontations into NBS.

### D.      2017 PMAP Goals

On January 30, 2017, Vedula was issued a new set of yearly objectives in his work performance plan under the Performance Management Appraisal Program ("PMAP").  While Vedula's 2016 PMAP consisted of four critical elements, his 2017 PMAP had 24 critical elements. According to Vedula, this "600 percent" increase in critical elements "set him up to fail" because he would have to engage in a number of lower-level duties typically performed by contractors, which would keep him from performing the higher-level duties required by his PMAP.  J.A. 402. Employees who receive the highest overall rating may be eligible for a performance award of five percent of their salary, while employees receiving the second or third highest overall ratings could be eligible for lesser performance awards.  Other Systems Accountants, including Ferguson, received the same additional elements in their PMAPs, and Vedula had discussions with colleagues in which they told him that they had received similar changes to their PMAPs.

### E.      Overtime Pay

In January and February 2017, Vedula accrued over 20 overtime hours after working more than 40 hours over a span of two weeks.  As was customary, he submitted a hard copy document to Perrone for approval of compensatory leave hours known as "comp time."  J.A. 197.  After several months, Vedula still had not received the comp time he had requested, and when he followed up with Perrone in July 2017, she said she had misplaced the paperwork.  Perrone then asked Vedula to re-submit the form.  Because Vedula had filled out only a hard copy form and no longer had a copy of it, he did not re-submit the form but informed Perrone by email that he was owed 27 hours.  Vedula never received comp time for those hours.  J.A. 197.  On a later occasion,

when Vedula submitted a form for comp time on different set of 12-13 hours of overtime, he did receive comp time.

**F.      After-Hours Work**

Beginning in February 2017, at Perrone's direction, Vedula was required to work on tasks normally performed by contractors before and after standard work hours, such as after 9:00 p.m., and sometimes between 2:00 a.m. and 4:00 a.m. Instead of receiving comp time, Vedula was instead told to come to work later the next day to account for the extra time worked the previous night. This off-hours work was required at least once a week and lasted at least until Vedula left on medical leave in September 2017.

According to Perrone, she asked Vedula, as the AP Lead, to take over these functions previously performed by contractors after she discovered in February 2017 that many contractors were conducting functions that should have been performed by federal staff. Vedula's tasks included software updates and configurations that cannot be made during the regular workday. Perrone claims that the majority of Systems Accountants received these types of off-hours work assignments during the same time frame.

**G.      The June 2017 Meeting**

According to Vedula, he was publicly bullied by Perrone at a project status meeting that took place on or about June 7, 2017 ("the June 2017 Meeting"). Prior to such meetings, business area leads submit information about incidents in their area of work and the status of the actions to address those incidents. Vedula asserts that he uploaded such information in advance of the meeting on behalf of AP, but during the meeting, a slide was shown stating "No activity provided by activity owner," J.A. 148, and Patricia Casillas, the contractor with the Program Management Office responsible for compiling the materials for meeting, told the group that she received no

8

information from Vedula. According to Vedula, when he objected and told her to check her information again, Perrone proceeded to "attack" him in a "very highly offensive tone," would not let him explain his actions, told him that there is "no argument on this and that is final," and told him "not to reply to her." J.A. 126, 199. Vedula considered Perrone's behavior "demeaning, angry, bullying and contemptuous" and the incident "a very loud public humiliation of me in front of all the staff." J.A. 126, 199. Vedula has asserted that such "escalating" is what Perrone "normally . . . does" to him. J.A. 199.

According to Casillas, although she had sent Vedula and other lead personnel a message at Perrone's direction instructing them on how to submit their information and also sent reminders in advance of the meeting warning that an empty slide would be displayed if the data was not submitted on time, she did not receive Vedula's information. Casillas has stated that when the empty slide relating to Vedula was shown at the meeting, Vedula asserted that he had done what was asked of him, became increasingly more anxious and agitated, and then became argumentative until she felt that he was berating her. According to Perrone, it was Vedula who was yelling at Casillas, so she told him to stop. Perrone contacted HR after the incident and provided a write-up of the incident, but Vedula received no reprimand as a result of Perrone's characterization of the incident.

### H.    2017 PMAP Mid-Year Review

On July 27, 2017, Perrone and Vedula met for his mid-year performance review meeting ("the Mid-Year Review"). According to Vedula, such meetings typically are short and are not scheduled, but on this occasion, Perrone made a point to schedule a formal meeting. On the day of the meeting, when Vedula arrived, Perrone asked him if he had reviewed his evaluation as she had requested, but Vedula had not, so she had him take it to review at his desk before returning.

When Vedula reviewed the evaluation, he was very upset with the ratings, which had declined from 4.5 points to 3.0 points since September 2016, and with statements made by Perrone in the evaluation which he considered "very wrong" and hurtful to someone who was genuinely working hard.  J.A. 202.  According to Perrone, when Vedula returned, as she began to discuss the evaluation, he raised his voice "in an aggressive manner" and stated that he would not sign off on the review because what she had said was incorrect.  J.A. 158.  Perrone claims that Vedula continued to shout and stood up multiple times, waving his hands in the air.  Vedula contends that he spoke in a normal tone of voice, with natural "high" and "low" tones, and that Perrone arranged for the unusually formal meeting to "purposefully" give him a reprimand.  J.A. 202.  On August 10, 2017, after consulting with an Employee Relations Specialist, Perrone issued an Official Letter of Reprimand to Vedula for "unprofessional and disrespectful behavior" at the Mid-Year Review.  J.A. 158.  In the Letter of Reprimand, which was placed in Vedula's Electronic Official Personnel Folder for up to two years, Perrone also rescinded Vedula's alternate work schedule ("AWS") and telework privileges.

Vedula contends that Perrone improperly shared Vedula's 2017 PMAP mid-year review with two other NIH employees, Brittany Hopson and Shante Thompson, by copying them on an email to which it was attached.  According to Hopson, and Thompson, in 2017 NIH moved the PMAP process to an electronic system, and they received copies of 2017 PMAPs to assist supervisors and employees with technical issues.  Both provided technical assistance to Vedula in uploading and reviewing electronic comments on his 2017 PMAP but have stated that they did not review its contents.

10

## II.    EEO Complaints

On September 25, 2016, Vedula made initial contact with the HHS Equal Employment Opportunity ("EEO") Office relating to the September 2016 Meeting and the failure of Singleton or Perrone to discipline Ferrer. On November 8, 2016, Vedula filed a formal complaint of discrimination. Vedula later amended that complaint on November 9, 2016, January 31, 2017, and February 23, 2017. In the fully amended EEO complaint, Vedula alleged discrimination and a hostile work environment on the basis of national origin and sex, as well as unlawful retaliation, based on the September 2016 Meeting, his non-selection as the Systems Accountant Leader, the issuance of the 2017 PMAP, and changes to his schedule to require late-night work. HHS issued a Final Agency Decision on November 7, 2017 concluding that Vedula was not subjected to discrimination or retaliation as claimed.

On August 22, 2017, Vedula again contacted the EEO Office to make a second complaint. After efforts to resolve the complaint though counseling were unsuccessful, Vedula filed a formal complaint on November 28, 2017. In the second complaint, Vedula asserted claims of discrimination and a hostile work environment based on race, color, religion, national origin, age, sex, and retaliation based on the sharing of his PMAP narrative with other employees, the failure to provide comp time for his overtime hours, Perrone's conduct at the June 2017 Meeting, and Perrone's Letter of Reprimand. HHS issued a Final Agency Decision as to this second EEO complaint on August 30, 2018, concluding that Vedula was not subjected to discrimination or retaliation as claimed.

In early 2018, after Vedula had filed the second EEO complaint and had returned from a medical leave that began in September 2017, Perrone expressed her frustration with the fact that Vedula and other employees had filed EEO complaints. Specifically, she told Ferrer that she was

11

going to "fight back" and "make it difficult for them" so they would "hopefully . . . leave." J.A. 332.   Perrone made such statements on approximately five occasions to Ferrer, often in the presence of Singleton.   Perrone told Ferrer to give Vedula tasks with unrealistic deadlines or a broader scope to the assignment to set him up to fail, so she could then take the opportunity to berate him in front of others for not completing the assignment successfully.   For example, on or about February 14, 2018, Perrone instructed Ferrer to give Vedula an assignment relating to AP invoices with a short deadline, and Perrone later berated Perrone in front of federal staff and contractors when he could not complete it on time.   On another occasion, on or about March 28, 2018, Perrone instructed Ferrer to monitor Vedula's activities to identify work he relied on contractors to conduct, and then to instruct the contractors not to assist Vedula.

In April or May 2018, Ferrer approached Vedula after a meeting and apologized for "harassing" him and participating in harassment by others and told Vedula that Perrone was trying to get him to leave NIH. J.A. 193.   Ferrer later forwarded to Vedula emails that illustrated the kinds of difficult assignments deliberately given to him to cause him to fail.   Ferrer sent the emails to Vedula because she wanted him to know that Perrone was "after him" and because she did not agree with Perrone's "ideology." J.A. 330.

### III.   Procedural History

On February 6, 2018, Vedula filed a timely Complaint in this Court.   In his Second Amended Complaint ("the Complaint"), Vedula asserts causes of action under Title VII for discrimination and a discriminatory hostile work environment (Count I) and for retaliation and a retaliatory hostile work environment (Count II).   Although he does not specifically identify the basis of discrimination, where in the Complaint and his memorandum in opposition to the Motion

12

Vedula has provided information only on his national origin and sex, the Court construes the Complaint as asserting discrimination based on those two protected classes.

## DISCUSSION

In its Motion for Summary Judgment, HHS argues that based on the record evidence, Vedula cannot establish a *prima facie* case of discrimination or retaliation under Title VII for most of his claims because they are not based on adverse employment actions against him, and that he ultimately cannot establish that HHS's legitimate, non-discriminatory and non-retaliatory reasons for any adverse actions against him were pretextual. HHS also argues that there is insufficient evidence to support a claim of a discriminatory or retaliatory hostile work environment.

### I.    Legal Standard

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

### II.    Discrimination

Vedula alleges national origin and sex discrimination based on numerous incidents during 2016 and 2017, including (1) the harassment by Ferrer at the September 2016 Meeting, the failure

13

of management to discipline her for that conduct, and the disparate treatment between that lack of discipline as compared to his Letter of Reprimand following the 2017 Mid-Year Review; (2) his removal from the OPE Project and replacement as AP Lead by Wadhwa; (3) the failure to promote him to the Systems Accountant Leader position; (3) the changes to his 2017 PMAP; (4) the failure to provide comp time for certain overtime work; (5) the requirement that he conduct late-night work; (6) harassment by Perrone at the June 2017 Meeting and through the Letter of Reprimand; and (7) the sharing of his PMAP narrative with other employees.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The statute requires a plaintiff to establish a claim through one of two methods. As relevant here, the plaintiff may either demonstrate through direct or circumstantial evidence that his membership in a protected class "motivated the employer's adverse employment decision," or the plaintiff may proceed through the approach espoused in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). Under the *McDonnell Douglas* framework, the employee must first establish a *prima facie* case of discrimination. *Hill*, 354 F.3d at 285. If the employee does so successfully, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* Finally, if such a showing is made, the burden shifts back to the plaintiff to prove "by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." *Id.* Vedula alleges no direct evidence that any adverse

employment actions were the result of discrimination based on his membership in a protected class. He therefore must establish his case through the *McDonnell Douglas* framework.

### A.    *Prima Facie* Case

HHS does not dispute that among his claims, Vedula has properly alleged a *prima facie* case based on the failure to promote him to the position of Systems Accountant Leader. *See Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 544 (4th Cir. 2003) ("It has long been clear that failure to promote an employee constitutes an adverse employment action for the purposes of § 2000e–3."). To prove a *prima facie* case of discriminatory non-promotion under *McDonnell Douglas*, a plaintiff must show that:  (1) the plaintiff is a member of a protected class; (2) the plaintiff applied for the position in question; (3) the plaintiff was qualified for the position; and (4) the plaintiff was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994). There is no dispute that Vedula is a member of a protected class as a man of Indian national origin; that he applied, interviewed, and was considered for the Systems Accountant Leader role; and that he was qualified as he met the basic requirements as established by NBS. Here, Vedula has also demonstrated that the role was filled by an individual not within the same protected classes, specifically, Ferrer, who is a Black woman. *Id.* at 458–59 (holding that to satisfy the fourth prong, the plaintiff, who was African American, "need only show that the position was filled by a white applicant"). Thus, Vedula has stated a *prima facie* case for failure to promote.

As to Vedula's other discrimination claims, based on disparate treatment, to establish a *prima facie* claim for such discrimination, a plaintiff must present facts demonstrating:  (1) the plaintiff's membership in a protected class; (2) the plaintiff's satisfactory job performance; (3) that the plaintiff was subjected to an adverse employment action; and (4) that similarly situated

15

employees outside the protected class received more favorable treatment. *White v. BFI Waste Svcs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004).  Where HHS disputes only the third and fourth elements, the Court will only address those requirements below.

### 1.    Adverse Employment Action

"An adverse employment action is a discriminatory act that 'adversely affects the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)).  Examples of adverse employment actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).  Such a "tangible employment action in most cases inflicts direct economic harm." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998).  Accordingly, actions that do not cause a "decrease in compensation, job title, level of responsibility, or opportunity for promotion" ordinarily do not constitute adverse employment actions under Title VII. *Boone*, 178 F.3d at 256–257.

In alleging that he was denied compensation for overtime hours worked, Vedula arguably has alleged an adverse employment action because such a denial affected his pay and thus the terms and conditions of employment. *See Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016) (holding that denial of overtime pay that was a significant and expected part of an employee's compensation may constitute an adverse employment action); *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 599 (D. Md. 2011), *aff'd*, 465 F. App'x 274 (4th Cir. 2012) (stating that a salary employee required to work more hours with no change in pay may be subject to an adverse employment action because there was an effective pay cut).

16

Aside from the claim relating to overtime compensation, HHS correctly argues that the other allegedly discriminatory actions do not qualify as adverse employment actions for purposes of a Title VII claim because they do not affect the terms, conditions, or benefits of employment. *See Holland*, 487 F.3d at 219. First, as to the alleged harassment and verbal abuse by Ferrer at the September 2016 Meeting and by Perrone at the June 2017 Meeting, incidents of yelling at an employee at a meeting and refusing to address employment-related complaints generally do not "rise to the level of an adverse employment action for Title VII purposes." *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997) (finding that an incident of yelling at an employee at a meeting, directing other employees to spy on her, and refusing to communicate about the employee's complaints did not constitute an "adverse employment action" under the then-identical standard for a retaliation claim); *see Booth v. County Exec.*, 186 F. Supp. 3d 479, 485, 485 (D. Md. 2016) (holding that a plaintiff's claim that his supervisor "humiliated him in two meetings" and engaged in "mean-spirited behavior" did not assert an adverse employment action).

Second, the various undesirable changes to Vedula's role, including his removal as the project manager for the OPE Project, his alleged replacement in a leadership role by Wadhwa, changes to his PMAP elements, and the requirement to undertake late-night assignments, also are not actionable adverse employment actions. A change to a new or different job assignment at the same salary level that is "less appealing to the employee" or that causes "modest stress not present in the old position," constitutes an adverse employment action only where there was a "significant detrimental effect," such as "[a] decrease in compensation, job title, level of responsibility, or opportunity for promotion." *Holland*, 487 F.3d at 219 (quoting *Boone*, 178 F.3d at 256–57). Vedula has acknowledged that his designation as the project manager for the OPE Project, even while providing leadership and managerial responsibilities, did not come with a formal new job

title or an increase in pay. Thus, his loss of that informal designation did not constitute an adverse employment action under Title VII. *See James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 374, 376–77 (4th Cir. 2004) (holding that the removal of an engineer from a role as the Project Manager for a large contract and reassignment to another role did not constitute an adverse employment action when it did not affect his formal job title, pay, benefits, and other terms and conditions of employment). Likewise, while Vedula generally alleges that he was removed from a position of leadership, whether as the project manager of the OPE Project or as the AP Lead, and replaced by Wadhwa, he has not provided any facts establishing that any loss of the AP Lead position affected his formal job title or pay. In any event, he has not provided any details on when the change involving Wadhwa occurred or produced any evidence of a demotion—in fact, Vedula appears to have had the AP Lead role as of the June 2017 Meeting when he was required to report data in his team lead capacity.

As to the substantial increase in Vedula's PMAP critical elements, "[a]dditional duties" typically do not constitute adverse employment actions unless "they are so weighty as effectively to change these basic terms of employment." *Thorn*, 766 F. Supp. 2d at 599. Here, while the number of critical elements increased, a comparison of the 2016 and 2017 PMAP critical elements reveals that the 2017 version largely memorialized duties and responsibilities that were already required of employees in Vedula's position. For instance, the added elements included requirements that Vedula had to complete various training programs related to workplace legal responsibilities and conduct, follow internal protocols for administrative tasks such as time keeping, documentation, and file storage, have working knowledge of various areas within the accounting area, and generally stay engaged in the job by suggesting ways to increase efficiency, collaboration, or effectiveness. Notably, Perrone has stated that the 2017 PMAP critical elements

did not include responsibilities that were "not already in [Vedula's] Position Description" as a Systems Accountant at NBS. J.A. 84. Particularly where Vedula acknowledged that the changes to the PMAP critical elements were not unique to him, the PMAP changes did not significantly alter the "basic terms of employment" and did not amount to an adverse employment action. *Thorn*, 766 F. Supp. 2d at 599. Relatedly, to the extent that Vedula's performance evaluation ratings declined, those changes do not constitute an adverse employment action absent evidence that the change actually affected the terms and conditions of employment such as his pay or opportunities for promotion. *James*, 368 F.3d at 377–78. Vedula has not provided such evidence. Finally, the fact that Vedula was given late-night assignments, even though undesirable, did not constitute an adverse employment action under Title VII because he was allowed to shift his work schedule based on the additional hours worked late at night. "The mere fact that a new job assignment is less appealing to the employee . . . does not constitute adverse employment action." *James*, 368 F.3d at 376–77 (4th Cir. 2004); *see McCain v. Waste Mgmt., Inc.*, 115 F. Supp. 2d 568, 572, 575 (D. Md. 2000) (holding that, based on controlling precedent, a job reassignment to the night shift, while still occasionally having to report to work during the day shift, was not an adverse employment action where the plaintiff did not provide evidence that the reassignment had a negative effect on him in terms of employment benefits, job title, or supervisory responsibility); *Chika v. Planning Research Corp.*, 179 F. Supp. 2d 575, 587 (D. Md. 2002) (holding that a transfer to the night shift, "[w]hile inconvenient . . . does not automatically constitute an adverse employment action" absent evidence of a negative impact on job title, pay, or work responsibilities under the then-identical standard for a retaliation claim).

Third, the Letter of Reprimand issued by Perrone following the Mid-Year Review, that would stay in Vedula's personnel file for no more than two years, did not constitute an adverse

employment action because Vedula has not presented evidence that it affected his pay or other terms and conditions of employment. *See Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 755 (4th Cir. 1996) (holding that a formal disciplinary warning, which was subsequently removed from an employee's personnel record, was not an adverse action); *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 330 (D. Md. 2003) (holding that an HHS formal, written reprimand that, by policy, remains in an official personnel file for two years but does "no tangible harm" as to the terms or conditions of employment does not qualify as an adverse employment action); *see also Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 431 (4th Cir. 2015) (stating that "reprimands . . . occur with some frequency in the workplace" and thus are "much less likely to involve adverse employment actions than the transfers, discharges, or failures to promote whose impact on the terms and conditions of employment is immediate and apparent"). The fact that the Letter of Reprimand also rescinded Vedula's AWS and telework privileges does not alter this conclusion. *See McNair v. District of Columbia*, 359 F. Supp. 3d 1, 10 (D.D.C. 2019) (holding that the denial of AWS and denial of the right to work from home are not adverse employment actions). This conclusion applies equally to a claim based on disparate treatment in discipline arising from a comparison between Vedula's receipt of a Letter of Reprimand for allegedly improper verbal responses to Perrone at the Mid-Year Review and the lack of discipline of Ferrer for verbally abusing Vedula at the September 2016 Meeting. *See Skipper v. Giant Food, Inc.*, 187 F. Supp. 2d 490, 492–93 (D. Md. 2002) (holding that the plaintiff's claim of disparate discipline failed to meet the "threshold requirement of Title VII" of the existence of "adverse employment actions" where the primary discipline against the plaintiff consisted of a written warning), *aff'd*, 68 F. App'x 393 (4th Cir. 2003).

For these reasons, aside from his failure-to-promote claim and his claim relating to uncompensated overtime, Vedula has not alleged any other actionable adverse employment actions.

### 2.    Similarly Situated Employee

To the extent that Vedula's claim relating to overtime compensation meets the other *prima facie* case requirements, it fails on the fourth element, whether there were similarly situated employees outside the protected class who received favorable treatment under comparable circumstances. *See White*, 375 F.3d at 295.  At the outset, Vedula disputes whether he is required to present comparator evidence at all if he is able to offer evidence of pretext for an employer's actions.  Vedula is correct that a plaintiff in a discrimination case is "not required as a matter of law to point to a similarly situated . . . comparator in order to succeed on a . . . discrimination claim." *Bryant*, 333 F.3d at 545.  Here, however, where Vedula's discrimination claim relating to overtime comp time can succeed only upon a showing that HHS treated him less favorably on this issue as compared to colleagues outside his protected classes, "the validity of [his] prima facie case depends upon whether that comparator is indeed similarly situated." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010).  Vedula has the burden "to demonstrate that similarly situated employees were not treated equally." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981).

Vedula, however, has offered no evidence of similarly situated colleagues from outside his protected classes receiving more favorable treatment when they submitted paperwork for overtime compensation.  Vedula also admits that when he later submitted paperwork for overtime, he received the appropriate compensatory award.  Thus, as to the adverse employment action of denial of overtime, Vedula has not met his burden to establish a *prima facie* case.

**B.    Legitimate Non-Discriminatory Reason**

Where Vedula has met his burden to establish a *prima facie* case of discriminatory failure to promote, the burden shifts to HHS to show a legitimate, non-discriminatory reason for the promotion decision. *See Hill*, 354 F.3d at 285; *Carter*, 33 F.3d at 458.  This burden is "only one of production, not persuasion." *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998).  Because this step "precedes the credibility-assessment stage," all that is required of the defendant at this point is the introduction of evidence which, if "*taken as true*, would *permit* the conclusion" that there was a non-discriminatory reason "for the adverse action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).

HHS argues that the selection of Ferrer instead of Vedula for the Systems Accountant Leader position was based on her superior rating by a panel of independent interviewers from outside NBS with expertise in accounting and finance.  Despite Ferrer's short tenure at NBS before her elevation, she had served as an accountant within the U.S. Department of Homeland Security, in both the Transportation Security Administration and the United States Coast Guard Finance Center, and thus gained experience directing an integrated project team of federal and contractor staff and serving as a lead systems accountant at the Coast Guard.  In its evaluation of Ferrer, the interview panel wrote that "it was evident that she had extensive experience with Oracle e-business applications and a comprehensive understanding of federal accounting principles" and found that she was able to provide "additional details on more complex accounting relationships." J.A. 431. Ferrer's ability to explain "end-to-end business processes from both an accounting and systems p[er]spective showed that she is truly a systems accountant." *Id.*  The panel also concluded that Ferrer had demonstrated comprehensive knowledge of the NBS environment and effectively

22

articulated her vision of leading a team in developing, designing, and implementing critical accounting projects within NBS.

By contrast, the panel's assessment of the other three candidates identified various weaknesses, both in responding to technical questions and in demonstrating leadership and management skills. As to Vedula specifically, the panel found that he could not answer certain basic questions about federal accounting. The panel also wrote that Vedula "was not able to answer any of the technical questions with any level of accuracy" and "failed to demonstrate the accounting knowledge required for a systems accountant lead role." J.A. 433. He also "was unable to demonstrate any detailed knowledge of many of the initiatives underway at HHS." *Id.* When asked about management experience, Vedula "was unable to clearly explain his leadership/management style." *Id.* Where this independent panel recommended that NBS select Ferrer based in significant part on the strength of her interview as compared to the other candidates, HHS has identified a legitimate non-discriminatory reason for the selection of Ferrer, which was ultimately made by Singleton after successful reference checks and with the approval of the NIH Deputy Director for Management. *See Hux v. City of Newport News*, 451 F.3d 311, 319 (4th Cir. 2006) (holding that "[i]nterviews are an important tool . . . and [the court] may not lightly overturn the reasonable conclusions an employer reaches after actually meeting with a candidate face-to-face").

## C.    Pretext

If the defendant makes a showing of a legitimate, non-discriminatory reason for the non-selection, the burden then shifts back to the plaintiff to show that the stated reason was a "pretext for discrimination." *Hill*, 354 F.3d at 285. Vedula ultimately bears the burden to show by a

preponderance of the evidence that HHS's explanations are "pretextual or otherwise unworthy of credence." *Henson v. Liggett Group, Inc.*, 61 F.3d 270, 275 (4th Cir 1995).

To show pretext, Vedula relies on evidence that the selection process, including the interviews relied upon by HHS in the ultimate selection, was skewed in favor of Ferrer. Vedula correctly alleges that the vacancy announcement for the position remained open for only three business days, or five calendar days, the minimum number of days that a posting must be open, which he argues was calculated to advantage Ferrer, who, as discussed below, had advance knowledge that the position would be advertised. Second, Vedula questions the fact that the position required only one year of experience at a GS-13 grade, which he asserts was designed to allow Ferrer to qualify even though she had been at NBS for only a few months when the position was created. Most importantly, Vedula focuses on evidence that Perrone shared some of the interview questions in advance of the interviews, based on an email sent by Perrone to Ferrer on October 4, 2016, after the decision was made between July and September 2016 to select a Systems Accountant Leader and before the position was actually posted in December 2016. The email read "Fyi..." and had an attachment labeled "acct_lead_questions.doc." J.A. 348. In response, Ferrer responded, "Looks good. I'm excited." J.A. 351. Most of the questions in the attachment also appear in the final questions used by the panelists for the Systems Accountant Leader role. *Compare* J.A. 349 and J.A. 484–485. Although Perrone claims that these questions were originally provided by Ferrer to her for use in the hiring of other systems accountants, Ferrer has denied ever working on interview questions with Perrone for other hiring processes. Viewing the evidence in the light most favorable to the nonmoving party, the Court finds that there is, at a minimum, a genuine issue of material fact whether Perrone improperly influenced the hiring and interview process to favor Ferrer over Vedula and other potential candidates.

While such evidence could support a finding of pretext that could negate the identified legitimate, non-discriminatory reason for selecting Ferrer, the Court nevertheless finds that Vedula has not provided sufficient evidence to support the conclusion that the actual reason for this differential treatment was based on discrimination against Vedula based on national origin or sex. "Although intermediate evidentiary burdens shift back and forth under [the *McDonnell Douglas*] framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Even if a plaintiff has established a *prima facie* case and presented evidence that the asserted justification for the action was false, the evidence may still be insufficient to support a finding of liability. *Id.* at 148. Thus, the Court must consider "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered" to determine whether judgment as a matter of law is appropriate. *Id.* at 148–49.

Here, Vedula has identified no instance in which Singleton, Perrone, or Ferrer has ever said anything derogatory about his national origin or sex, or even his race or religion. While Vedula argues that Ferrer was favored over him because she is a Black woman, the supervisors who participated in the promotion of Ferrer included a man and a woman of different races, and the actual decisionmaker was Singleton, a non-Black male. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010) (stating that in a Title VII case, "[i]t is the decision maker's intent that remains crucial"); *James v. Verizon*, 792 F. Supp. 2d 861, 869–870 (D. Md. 2011) (holding that evidence that the decision maker is a "member of the same protected class" as the plaintiff "weakens any possible inference of discrimination"). Thus, even if the evidence that the

25

hiring process was manipulated to favor Ferrer could support a finding that the ostensible reason

for selecting Ferrer—the conclusions of the independent interview panel—were tainted and thus

pretextual, there is insufficient evidence to support a finding that the true reason for this disparate

treatment was discrimination based on national origin or sex. *See Williams v. Cerberonics, Inc.*,

871 F.2d 452, 459 (4th Cir. 1989) (holding that a plaintiff fails to demonstrate pretext where the

only evidence of discriminatory intent is the plaintiff's own assertions and subjective beliefs). The

Court will therefore grant the Motion as to Vedula's claims of discrimination.

**III.    Retaliation**

In Count II, Vedula alleges retaliation in violation of Title VII. A retaliation claim may be

established through direct or indirect evidence of retaliatory animus or through the burden-shifting

framework analogous to the discrimination framework set forth in *McDonnell Douglas*. *See*

*Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Under either approach,

the plaintiff must show that the adverse action would not have occurred in the absence of the

employer's retaliatory animus, such that retaliation was the "real reason" for the action. *Id.* at

251–52. As discussed below, Vedula has identified direct evidence of retaliatory motive but also

proceeds under the *McDonnell Douglas* analysis, under which:

> [A] plaintiff bears the initial burden of establishing a prima facie case of retaliation.
> Once this burden is carried, the burden shifts to the defendant, who is obliged to
> articulate a legitimate, non-retaliatory justification for the adverse employment
> action. If the defendant carries this burden, the onus is on the plaintiff to then
> demonstrate that the non-retaliatory reason advanced by the defendant is a mere
> pretext.

*EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005) (internal citations omitted);

*cf. McDonnell Douglas*, 411 U.S. at 802–04.

A. *Prima Facie* **Case**

To establish a *prima facie* case of retaliation, a plaintiff must present facts that establish that (1) the plaintiff engaged in a protected activity; (2) the employer took a materially adverse action against the plaintiff; and (3) there was a causal link between the two events. *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015). There is no dispute that Vedula engaged in protected activity. Following the September 2016 Meeting, Vedula told Perrone and Singleton on September 19 or 20, 2016 that he planned to file an EEO complaint, and he made his first contact with the EEO Office to assert a claim of discrimination on September 25, 2016. Several days later, on September 30, 2016, Perrone and Singleton received an email from Chinara Brown, an HHS EEO Counselor, informing them about Vedula's allegations of discrimination. Vedula filed a formal EEO complaint on November 8, 2016.

For a retaliation claim, a "materially adverse" action is one which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). It need not meet the more stringent definition of an "adverse employment action" required for a discrimination claim. *See id.* at 64 (holding that "the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment"). Here, only actions taken after Vedula's first protected activity, on or about September 19, 2016, could potentially be deemed retaliatory. *See Baqir v. Principi*, 434 F.3d 733, 748 (4th Cir. 2006) (holding that an employer must have known about an employee's protected activity in order to have engaged in unlawful retaliation); *see also Buchhagen v. ICF Int'l, Inc.*, 650 F. App'x 824, 830 (4th Cir. 2016) (holding that "an employment action cannot be adverse when the action was contemplated before the protected activity occurred"). Accordingly, the alleged harassment at the September 2016

27

Meeting cannot qualify as retaliation because it pre-dates Vedula's first instance of protected activity.

The non-selection of Vedula for the role of Systems Accountant Leader and the failure to compensate him for overtime work, which may constitute adverse employment actions for purposes of Vedula's discrimination claim, qualify as materially adverse actions for purposes of the claim of retaliation. Other adverse actions taken after Vedula initiated protected activity, even if not qualifying as an adverse employment action affecting the terms and conditions of employment for purposes of his discrimination claim, constitute materially adverse actions for purposes of the retaliation claim because they would have "dissuade[d] a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68. These actions include the removal of Vedula as the project manager of the OPE Project to the extent it occurred after Vedula first complained about discrimination, the expansion of Vedula's PMAP critical elements, and the issuance of the Letter of Reprimand, which found that he had engaged in misconduct, warned him of more severe discipline, and terminated Vedula's AWS and telework privileges. *See Belyakov v. Leavitt*, 308 F. App'x 720, 729 (4th Cir. 2009) (holding that issuing an official reprimand was a materially adverse action for purposes of a retaliation claim because it would dissuade a reasonable worker from making or supporting a charge of discrimination). *But see Parsons v. Wynne*, 221 F. App'x 197, 198–99 (4th Cir. 2007) (stating that removal of alternate work schedule privileges was not a materially adverse action for purposes of a retaliation claim). The requirement that Vedula perform certain work late at night over an extended period of time, even if offset by fewer hours during the business day, was also a materially adverse action because it disrupted his sleep and other lifestyle routines. *See Burlington N.*, 548 U.S. at 70–71 (stating that "[c]ommon sense suggests that one good way to discourage an employee . . . from bringing

discrimination charges" would be to insist that the employee "spend more time performing the more arduous duties and less time performing those that are easier or more agreeable").

As for causation, HHS argues that there was no causal nexus between Vedula's initial EEO activity in September 2016 and the materially adverse actions that followed. While there is no bright line rule on this issue, the United States Supreme Court has held that the temporal nexus must be "very close" to alone establish causation and has referenced cases in which a three- or four-month lapse between protected activity and materially adverse action was too long to establish a causal connection by temporal proximity alone. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *see Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012). When the time between events is too great to establish causation based solely on temporal proximity, a plaintiff must present "other relevant evidence . . . to establish causation" such as "continuing retaliatory conduct and animus" in the intervening period. *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007).

Here, the Court notes that Vedula's formal EEO complaint was not filed until November 2016, only two months before the non-selection in January 2017. Vedula also made several amendments to his complaint in January 2017 and February 2017, in the same time frame as other materially adverse actions, such as the PMAP amendments in January 2017, the imposition of a requirement that he work late at night beginning in February 2017, and the failure to compensate him for overtime work in March 2017. The June 2017 Meeting and the Letter of Reprimand followed a few months later. Where "[t]hese intervening events" of materially adverse actions occurred "regularly" after Vedula's complaint, they "can reasonably be viewed as exhibiting retaliatory animus." *Id.* at 651 (finding sufficient evidence to support causation from a series of events between one and six months after the protected activity).

Where the first of several materially adverse actions took place two months after the filing of a formal EEO complaint and continued in succeeding months while Vedula engaged in amendments to his complaint, the temporal proximity of the events is sufficient to satisfy the causation element of the *prima facie* case. This conclusion is bolstered by direct evidence, as discussed below, that Perrone had a retaliatory animus against Vedula. *See infra* part III.C.

### B.      Legitimate Non-Retaliatory Reason

When a *prima facie* case has been established, the burden shifts to HHS to show a legitimate, non-retaliatory reason for the adverse action. Because this step "precedes the credibility-assessment stage," all that is required of the defendant at this point is the introduction of evidence which, if "*taken as true*, would *permit* the conclusion" that there was a non-retaliatory reason "for the adverse action." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (applying this standard to a discrimination claim). HHS is not required to prove the absence of a retaliatory motive. *Henson*, 61 F.3d at 274 (considering a discrimination claim).

Here, HHS offers the same reasons that constituted the legitimate, non-discriminatory reason for the non-selection of Vedula for the Systems Accountant Leader position, which is that the decision was based on the recommendation of an independent panel of reviewers who determined Ferrer performed better during the interview than Vedula and the other candidates. *See supra* part II.B. HHS provides individual reasons as to the other materially adverse actions. For instance, Perrone testified that the change to the PMAP critical elements was made for all System Accountants under her supervision and therefore was not the result of Vedula's protected activity. As to the denial of overtime compensation, Perrone stated that she inadvertently failed to process Vedula's original form and then Vedula never resubmitted the required form. As for the requirement that Vedula work overnight hours, Perrone testified that this change was made

because she discovered that contractors were improperly conducting those overnight assignments, and that Vedula as the AP Lead was the appropriate person to take on this activity. Finally, Perrone has testified that Vedula was the instigator of the dispute at the June 2017 Meeting, and that his Letter of Reprimand was proper based on his unprofessional reaction to her feedback during the Mid-Year Review. Because, at this stage of the burden-shifting framework, HHS's burden is "only one of production, not persuasion," *Causey*, 162 F.3d at 800, the Court finds that HHS has sufficiently advanced legitimate non-retaliatory reasons across various alleged retaliatory activities.

### C.    Pretext

The final step in the analysis is to assess whether the evidence supports a finding that the proffered non-retaliatory reasons were pretextual, and that the true reason for the materially adverse actions was retaliation for Vedula's protected activity. Although Vedula has not provided specific evidence of retaliatory motivation directly associated with the specific instances of materially adverse actions, he has identified direct evidence of a broad retaliatory motive underlying actions taken relating to Vedula. In her deposition, Ferrer testified that in 2018, after Vedula returned from medical leave that had begun in September 2017, and after he filed a second EEO complaint on November 28, 2017, Perrone told her on multiple occasions about her intent to retaliate against Vedula and others for filing EEO complaints. Specifically, Perrone told Ferrer, in the presence of Singleton, that she wanted to "fight back" and "make it difficult" for Vedula and Hwang, who had also filed an EEO complaint, so they would "leave" NIH. J.A. 332. Ferrer testified that Perrone made these types of statements on "numerous" occasions, as many as five different times, as she was "frequently frustrated" about the EEO complaints. J.A. 332. After making such statements, Perrone then arranged to give Vedula aggressive deadlines and

31

assignments with increased scope to set him up to fail. On one occasion, in February 2018, Perrone asked Ferrer to assign Vedula a task that Perrone knew he "would fail at" because the target timeline was not realistic, so that later, in a meeting, Perrone could, and did, berate Vedula for "a long period of time in front of both contractors and [federal] staff" about not completing work on time. J.A. 330–331. Ferrer apparently felt badly about this and other incidents and therefore apologized to Vedula, specifically told him about Perrone's retaliation, and shared documents relating to it.

Although this direct evidence that Perrone deliberately retaliated against Vedula for filing an EEO complaint derives from 2018, it supports a reasonable inference that Perrone's retaliatory animus motivated the earlier materially adverse actions in 2017. Thus, considering the facts in the light most favorable to Vedula, the Court finds that there is sufficient evidence to create a genuine issue of material fact whether the proffered legitimate, non-retaliatory reasons for the 2017 actions were pretextual, and whether the true reason for those actions was retaliation for Vedula's protected activity. *See Lettieri*, 478 F.3d at 651 (holding that the district court erred in granting summary judgment where there was sufficient evidence to show that the plaintiff was the victim of illegal retaliation). The Court will therefore deny HHS's Motion as to the retaliation claim. The Court need not address Vedula's alternative theory that HHS engaged in *per se* retaliation when Perrone informed Ferrer of Vedula's EEO complaint and thus failed to take proper precautions to secure the confidentiality of EEO information.

## IV.   Hostile Work Environment

Vedula also alleges a claim of a discriminatory hostile work environment in violation of Title VII, again presumably based on national origin or sex, as well as a claim of a retaliatory hostile work environment. A hostile work environment exists "when the workplace is permeated

with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer-Liberto*, 786 F.3d at 277.   To prove the existence of a discriminatory hostile workplace environment, a plaintiff must show that (1) the plaintiff experienced unwelcome harassment; (2) the harassment was based on the plaintiff's race, color, sex, religion, national origin, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Baqir*, 434 F.3d at 745–46.  Similarly, to prove a retaliatory hostile workplace environment, the plaintiff must show the same elements but demonstrate that the harassment was based on prior protected activity. *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009). "In measuring whether the offensive conduct is severe or pervasive enough to warrant relief, we must look at the totality of the circumstances, including: the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"   *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)).

Vedula asserts that the actions of Perrone and Ferrer created a hostile work environment. Vedula's allegations include all of the allegedly adverse actions discussed above, starting with his removal from the lead role on the OPE Project and including the alleged verbal abuse by Ferrer in the September 2016 Meeting, which was reported to but left unaddressed by Singleton and Perrone; the selection of Ferrer over Vedula for the Systems Accountant Leader position after unfairly structuring the requirements to favor Ferrer and improperly sharing the interview questions with her in advance; the expansion of Vedula's PMAP critical elements; the failure to

compensate Vedula for overtime work; the assignment of Vedula to conduct tasks between 9:00 p.m. and 4:00 a.m.; Perrone's alleged verbal abuse of Vedula at the June 2017 Meeting; Perrone's Letter of Reprimand in August 2017 that terminated his AWS and telework privileges; and the sharing of his 2017 PMAP with two other NBS employees. The evidence also includes Ferrer's accounts of Perrone deliberately arranging to have Vedula receive unrealistic assignments and deadlines that set him up to fail and provided Perrone with an excuse to verbally berate Vedula in front of his colleagues. Considered together, these incidents reveal that over a period of more than a year, Vedula experienced several instances of verbal abuse from supervisors or colleagues, was stripped of a leadership position and was denied a promotion, was unable to obtain compensation for overtime hours, was forced to work in the middle of the night, and received what he perceived to be an orchestrated Letter of Reprimand which terminated certain flexibilities Vedula had with his work schedule. Although some of these incidents were not particularly severe, and some consist of standard employment actions such as hiring decisions and changes to performance evaluation criteria, several of the verbal confrontations were insulting and humiliating, and the pervasiveness of these adverse actions was so pronounced, that the Court finds that a reasonable jury could find that this course of conduct amounted to a hostile work environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (requiring that the environment be one that "a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so").

This conclusion is bolstered by the evidence that Vedula began to feel "unsafe" from the "harassment and attacks" and started looking for other jobs, J.A. 206, and that as a result of being forced to work certain late-night hours, Vedula had to shift his sleep schedule to match his work schedule, which affected his work performance during the daytime. Ultimately, Vedula began

suffering from stress and depression, which led to a five-month leave of medical absence. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) (holding that part of the analysis of a hostile work environment is whether the actions unreasonably interfered with an employee's work performance). Where the conduct was led by Perrone, Vedula's immediate supervisor, and was in some instances condoned by Singleton, his second-level supervisor, it can be fairly imputed to the employer. *Faragher*, 524 U.S. at 807.

There still must be evidence that the hostile work environment was motivated by unlawful discrimination or retaliation. Here, Vedula has not presented adequate evidence of a discriminatory motive for the array of activity arguably amounting to a hostile work environment. As discussed above, Vedula has not identified any instances in which Singleton, Perrone, or Ferrer used any derogatory language or conduct associated with his national origin or sex, or even his race or religion. There is no evidence that they even referenced any of these characteristics. Thus, there is insufficient evidence to support a discriminatory hostile work environment claim. *See, e.g., Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 94 (1st Cir. 2018) (granting summary judgment on a hostile work environment claim based on a protected class because the plaintiff had not "done enough dot connecting for us to conclude that the harassment" was based on that protected class).

By contrast, Vedula has provided sufficient evidence to establish that the allegedly hostile work environment was motivated by retaliation for his filing of EEO complaints. As discussed above, in 2018, Perrone told Ferrer and Singleton that she wanted to make life difficult for Vedula because he had filed an EEO complaint, and that she deliberately retaliated against him by arranging for him to receive unrealistic assignments and deadlines and by using his failure to meet those requirements as an excuse to publicly berate him in front of his colleagues. *See supra* part

III.C.  With such evidence of Perrone's retaliatory intent, a reasonable jury could conclude that the full course of conduct against Vedula post-dating his initial EEO contact in September 2016, even incidents predating Perrone's explicit disclosure to Ferrer of her retaliatory intent, constituted a hostile work environment motivated by that retaliatory animus.  *See Gowski v. Peake*, 682 F.3d 1299, 1313 (11th Cir. 2012) (finding sufficient evidence to establish a retaliatory hostile work environment where there was evidence that the perpetrator's retaliatory intent was "well known").  Thus, the Court will deny the Motion as to the retaliatory hostile work environment claim.

### CONCLUSION

For the foregoing reasons, HHS's Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART.  The Motion will be granted as to the claims of discrimination and a discriminatory hostile work environment in Count I of the Second Amended Complaint and denied as to the claims of retaliation and a retaliatory hostile work environment in Count II.  A separate Order shall issue.

Date:  September 11, 2020

THEODORE D. CHUANG
United States District Judge